Philip E. Hantel
Arizona Bar No. 024963
Louisiana Bar No. 25078
710 W. Roosevelt St
Phoenix, Arizona 85007
(602) 370-9072

philiphantel@mac.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: CR-05-921-PHX-DGC |
| Plaintiff, | **MOTION TO SUPPRESS CONFESSION** |
| vs. | |
| CESAR GONZALEZ, | |
| Defendant | |

Cesar Gonzalez moves this Court, pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), and the other case law cited below, to suppress the confessions given after his arrest on September 21, 2005. This Court should suppress Mr. Gonzalez's confessions because he has low cognitive functioning and language barriers that rendered him unable to knowingly and intelligently waive his *Miranda* rights.

On December 3, 2007, the Government gave this Court and the defendant notice that it intended to introduce the defendant's statements in its case in chief. (Doc. 111). Although the Government did not disclose any further details of the confessions, such as

their date and time, Mr. Gonzalez believes that the statements in question are his post-arrest confessions to Special Agent Strong on September 21, 2005.

### Background

According to law enforcement reports, starting on July 25, 2005, the ATF and Phoenix Police Departments began surveillance and an undercover operation on an apartment complex located 1301 E. Thomas Rd. #106. Confidential informant (CI) #1050 was supplying law enforcement with information that drugs could be purchased from "Gino" in that apartment.

The next day, CI #1053 went to apartment number 106 and spoke with "Keone" and girlfriend "Tiffany." The CI discussed purchasing $325 worth of methamphetamine from them later that afternoon. According to CI #1053, "Keone" said he and "Ronko" worked together but that "Ronko" was the boss.

Upon returning to the apartment wearing recording device, CI #1053 discussed with "Ronko" the purchase of the methamphetamine, but "Ronko" stated he was short on quantity. "Keone" left in a white Blazer and "Ronko" left in a blue Buick. "Ronko" returned about thirty minutes later with a black male. At that point, the transaction with CI #1053 was completed. ATF later got the methamphetamine from the confidential informant and discovered it was about 14 grams.

Several other transactions took place, and both police and CI #1053 identified "Rocco" or "Ronko" as Mr. Cesar Gonzalez, the defendant before the bar.

On September 21, 2005, at about 6:40 AM, the ATF and Phoenix Police Department SAU (Special Assignment Unit) executed a search warrant at 1301 E. Thomas Road #106 and an arrest warrant for Cesar Ernesto "Rocco" Gonzalez. In the report concerning the execution of the search warrant, (ATF Report Number 103), S/A Strong indicates she read Gonzalez his *Miranda* warnings in the presence of PPD Sgt.

Thompson #4236. She indicates that Gonzalez understood those warnings but was unable to sign the form because he was handcuffed. Nevertheless, Gonzalez agreed to talk to law enforcement. It does not appear that law enforcement taped the conversation.

According to the report, Mr. Gonzalez said he was the renter of the apartment and had lived there for seven or eight months. Gonzalez went on to admit that he owned the .38 revolver found in "his room" and bought it from a guy who bought it from a pawnshop. The defendant went on to say he owned it for about 8-9 months and paid $200 for it. Gonzalez also admitted that he knew he could not purchase the gun himself because he was a convicted felon and on probation. Mr. Gonzalez added that the drugs recovered from a "Rust Curb" can in the house were also his, but only for personal use.

Mr. Gonzalez's submits that his confessions were not voluntary.

## **Argument**

Reports indicate that law enforcement presented the *Miranda* warnings to Mr. Gonzalez in English. However, Mr. Gonzalez is from Cuba and speaks predominantly Spanish. Further, the ATF's English version of the "Statement of Rights" form signed by Special Agent Strong shows that Mr. Gonzalez "did not want to sign" the waiver, not that he could not sign because he was in handcuffs, as ATF report 103 indicates.

Second, even assuming that Mr. Gonzalez was able to read the *Miranda* warnings in English, because of Mr. Gonzalez's low intellectual functioning, he could not have understood them, what protections they were offering, or what he was giving up.

For inculpatory statements made by a defendant during custodial interrogation to be admissible, the defendant must knowingly waive his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). *United States v. Binder,* F.2d 595, 599 (9th Cir. 1985). A valid waiver of those rights depends on the totality of the circumstances, including the background, experience, and conduct of the defendant. *United States v. Bernard S.,* 795

F.2d 749,751 (9th Cir. 1986). There is a presumption against waiver. *North Carolina v. Butler,* 441 U.S. 369, 373 (1966). With respect to this, the Government bears the burden of proving that the defendant waived his rights by a preponderance of the evidence. The Government must show that under the "totality of the circumstances," the defendant was aware of the "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421 (1986). The Government's burden to make such a showing is "great and the court should indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938).

In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, courts should examine any language difficulties encountered by the defendant during the interrogation. *United States v. Heredia-Fernandez,* 756 F.2d 1412, 1415 (9th Cir. 1985). Warnings given in a language which the defendant cannot comprehend do not convey the substance of the suspect's rights. *United States v. Alarcon,* 95 Fed. Appx. 954, 956 (10th Cir. 2004) (citations omitted). Thus, when a suspect only speaks a little of the language in which the *Miranda* warnings are given, the suspect cannot know that he can stand mute or request a lawyer or that the Government intends to use his statements against him. Such a lack of understanding cannot lead one to the conclusion that a suspect's waiver of those rights is knowing and voluntary.

Further, when applying the totality of the circumstances test, a court should also examine the circumstances surrounding the interrogation to decide whether the defendant knowingly and intelligently waived his constitutional rights. Some considerations might include the defendant's cognitive ability or verbal comprehension skills. It stands to reason that a defendant's mental capacity bears directly upon the question of whether the defendant could even understand the meaning of the *Miranda* rights and thereafter the

significance of waiving those rights. *Derrick v. Peteson,* 924 F.2d 813, 817-824 (9th Cir. 1990), *United States v. Glover,* 596 F.2d 857, 865 (9th Cir. 1979). When both language and cognitive ability come into play, as Mr. Gonzalez submits happened here, it only casts further doubt on the voluntariness of a confession.

In *United States v. Garibay,* 143 F.3d 534 (9th Cir. 1998) the Ninth Circuit addressed a case similar to the one before the bar. In *Garibay,* the defendant's primary language was Spanish, but law enforcement gave the *Miranda* warnings in English. However, beyond the language barrier, the defendant also had limited cognitive functioning. One doctor who examined the Garibay noted that he would need a visual demonstration of his rights, personal experience, and repeated concrete instructions to understand and intelligently waive his Miranda rights. *Garibay,* at 538, fn. 7.

In analyzing whether Mr. Garibay knowingly waived his *Miranda* rights, the court looked at whether the defendant:

(1). Had signed a written waiver.

(2). Was advised of this right in his native tongue.

(3). Appeared to understand his rights.

(4). Had the assistance of a translator.

(5). Had his rights individually and repeatedly explained to him.

(6). Had prior experience in the criminal justice system.

(*Garibay* at 538, citations omitted.)

If one applies these same factors here, it becomes apparent that, as in *Garibay*, Mr. Gonzalez's confessions were not knowing and voluntary.

First, the waiver provided by law enforcement to Mr. Gonzalez was in English, and says "did not want to sign" in law enforcement's handwriting. However, it is interesting to note that the report on the execution of the search warrant and subsequent

statement by Gonzalez says that "Gonzalez could not sign because he was handcuffed," not that he refused to sign, as the waiver shows. (ATF report 103).

Further, according to the September 21, 2005 pre-trial services report, Mr. Gonzalez is from Cuba and came to Florida in 1994 and continued to live there for four years. Then he moved to Oregon, where he lived for two years, and then to Phoenix, where he has been ever since. Being born in Cuba, Mr. Gonzalez's native tongue is Spanish. Further, Mr. Gonzalez uses an interpreter for court proceedings. Although law enforcement reports suggest that Mr. Gonzalez appeared to understand the *Miranda* warning, there is no indication that Mr. Gonzalez had the assistance of a translator, or that law enforcement explained his rights individually to Mr. Gonzalez.

Additionally, the assessment provided by Dr. Hollebeek on September 15, 2006, suggests that Mr. Gonzalez's results from the KBIT 2 test show he has extremely low intellectual functioning. However, it appears that Dr. Hollebeek performed the test in English, as he noted that the verbal scores were compromised because Mr. Gonzalez's native language was Spanish. Nevertheless, Dr. Hollebeek suggested that even the non-verbal scores would place Mr. Gonzalez in the borderline range and would suggest quite low functioning in general. (Hollebeek page 3).

Likewise, at FMC Butner, the doctors found similar characteristics in that Mr. Gonzalez was quite concrete and did not understand some of their questions, which had to be repeated by the telephone interpreter in very simple language. Also, the doctors noted that Mr. Gonzalez appeared to have childlike speech patterns. (Butner Page 7).

As for the final *Garibay* element, Mr. Gonzalez does have experience with the criminal justice system as the Pretrial Services report dated September 15, 2005, indicates.

Nevertheless, based on the language barriers along with Mr. Gonzalez's mental health and mental functioning issues, he submits that the totality of the circumstances shows that he did not voluntarily waive his *Miranda* rights on September 21, 2005. Mr. Gonzalez therefore prays that after due proceedings are held, this Court find that his confessions, given on September 21, 2005, were involuntary and therefore should be suppressed.

It is expected that excludable delay under 18 U.S.C. §3161(h)(8)(A),(B)(i) and (h)(1)(f) may result from this motion or from an order based thereon.

RESPECTFULLY SUBMITTED THIS 17th Day of February 2008,

*s/ Philip E. Hantel*
Philip Hantel
Arizona Bar No. 024963
Louisiana Bar No. 25078
710 W. Roosevelt St.
Phoenix, Arizona 85007
(602) 370-9072

CERTIFICATE OF SERVICE

I hereby certify that on the 17th Day of February, 2008 I electronically transmitted the attached document to the Clerks office using CM/ECF system filing to the following CM/ECF registrants;

Assistant United States Attorney
Raymond K Woo